**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| INNOVATIVE MOLD SOLUTIONS, INC., | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | NO. 4:15-CV-40010-TSH |
| v. | ) ) |  |
| ALL AMERICA INSURANCE COMPANY, INC., CENTRAL MUTUAL INSURANCE COMPANY, INC., and CENTRAL INSURANCE COMPANIES, | ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**AMENDED MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 32) AND PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 36)**

**July 12, 2016**

**HILLMAN, D.J.**

This is a dispute over an insurer's duty to defend in litigation brought against the insured by a third party. As explained below, I find that the insured has met its burden of showing that the underlying complaint alleged potentially covered property damage caused by an occurrence, as those terms are defined in the parties' commercial general liability policy and under applicable law. I further find that the insurer has not met its burden of showing that three of the policy's exclusionary provisions would apply to bar coverage. Accordingly, the insurer had a duty to defend the insured, and the insured is entitled to judgment on the pleadings on Count I of the complaint. Defendant's motion for judgment on the pleadings (Docket No. 32) is ***denied***, and Plaintiff's cross-motion for judgment on the pleadings (Docket No. 36) is ***granted***.

1

**Background**

The following facts are taken from the parties' pleadings and assumed true for the purposes of these motions. Innovative Mold Solutions, Inc. (IMS or Plaintiff) is an engineering and manufacturing company. All America Insurance Company, Inc. and Central Mutual Insurance Company, Inc. (collectively, All America or Defendants) are property and casualty insurance companies.[1] All America issued consecutive commercial general liability (CGL) policies to IMS, effective January 1, 2007 through December 31, 2010 (the Policies). The Policies provided coverage for "property damage" caused by an "occurrence," as those terms were defined in the Policies and under Massachusetts law, subject to certain exclusions. The Policies further provided that All America would defend IMS in any suit in which a third party sought to recover damages for covered property damage or bodily injury.

On February 15, 2012, IMS was served with a complaint, filed in the United States District Court in Connecticut. The action was a *qui tam* False Claims Act (FCA) suit, brought against IMS and others by a relator, Michael Ladas, on behalf of the United States (the Ladas action). The complaint alleged that IMS and other defendants had violated the FCA by manufacturing contractually noncompliant and defective components of ███████████, which were provided to the United States for use by ███████████████████. IMS notified All America of the claim and requested that All America provide and pay for IMS's defense, but All America denied having a duty to defend or indemnify under the facts as alleged in the Ladas complaint.[2]

---

[1] Plaintiff also seeks relief from "Central Insurance Companies." To the extent that "Central Insurance Companies" is a legal entity, this Court's order applies to it as well.
[2] IMS also presented All America with a written demand letter, pursuant to Mss. Gen. Laws ch. 93A and 176D, in October of 2014.

The facts pled in the Ladas complaint are as follows.  In 2005, the United States Army awarded ITT Corporation a ▇▇▇▇▇ contract ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Before the contract was awarded, the proposed product went through a rigorous qualification process.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  The electrical power is supplied through a power supply case of mechanically rigid plastic.  The case has a plated metal surface that serves as the contact area for inputting power into the tube assembly.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████.

ITT Power Solutions, a subsidiary of ITT Corporation, designed and manufactured the ██████████████████████████████████████████████. ITT Power Solutions subcontracted with IMS to manufacture the molded components of the power supply assembly. Prior to 2007, the power supplies sold under the contract were plated using the processes and materials that had been qualified by ITT, as required under the contract. During November of 2007, however, IMS changed the way that it manufactured the power supply case in two important ways. First, IMS changed the process for applying the silver epoxy material onto the power supply case ██████ ██████████████████████. Second, IMS changed the composition of the silver epoxy material. This new process was not approved by the qualification procedures.

At some point, ITT Power Solutions employees began to notice that defective power supply cases were being shipped from IMS. The defects included bubbling, flaking, and "burn" marks on the plating of the cases. ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. IMS initially withheld the unauthorized process change from ITT Power Solutions, but at some point ITT personnel became aware of the change and did not take action to correct it.

Eventually, ITT Power Solutions admitted to having knowledge of the manufacturing process changes. Thereafter, a struggle ensued between the quality control personnel at ITT Power Solutions, who wanted to disclose the manufacturing change and subject it to testing and qualification, and other high-level ITT personnel who did not wish to disclose the full nature of the problem. In March of 2010, ITT Power Solutions terminated its Director of Quality, Michael Ladas, who filed the Ladas action that underlies the instant insurance dispute.

Meanwhile, the government continued to order ██████████, and ITT's quality assurance personnel continued to observe that the power supply cases were peeling and had other irregularities, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

In total, approximately ████████████████████████ were sold to the United States government from November of 2007 to the spring of 2011 with power supplies produced under the changed process and materials. Ladas alleged that, through the date of the complaint in late 2013, ITT Corporation and ITT Power Solutions continued to conceal the nature of the process changes.

The Ladas complaint contained three counts: violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) (count I); violation of the FCA, 31 U.S.C. § 3729(a)(1)(B) (count II); and conspiracy to violate the FCA, 31 U.S.C. § 3729(a)(1)(C) (count III). Ladas sought the following relief: enjoin the defendants from continuing to violate the FCA; order a recommended inspection of all ███████████ manufactured from September of 2007 through April of 2011, ███████████████████████████████████████████████████████████████████████████████████████████████████████; enter judgment against the defendants in the amount of three times the actual damages sustained by the United States because of the defendants' actions, plus a civil penalty for each violation; and award the relator a share of the damages, plus costs.

In September of 2014, after IMS had spent more than $400,000 on legal fees in defense of these allegations, the Connecticut District Court dismissed the Ladas action on the grounds that (1) Ladas did not have standing to bring an FCA claim because of a release that he had executed, and (2) the complaint was not pled with sufficient particularly per Federal Rule of Civil Procedure 9(b). Ladas appealed this decision to the Second Circuit, which held oral arguments in May of 2015. At some point in 2015, IMS paid Ladas $25,000 to settle the suit, and Ladas withdrew his appeal as to IMS.[3]

IMS brought this suit against All America on January 9, 2015, seeking a declaratory judgment that All America had a duty to defend IMS in the Ladas action (count I). IMS also alleges breach of contract (count II); breach of implied covenant of good faith and fair dealing (count III); and violation of Chapter 93A (count IV). IMS seeks to recover the fees it paid for its

---

[3] It is not clear if Ladas also settled separately with the other defendants, or if the appeal remains pending.

defense in the Ladas action, as well as its fees for bringing the instant action, with treble damages and interest. All America moved for judgment on the pleadings (Docket No. 32), and IMS filed a "cross-motion for judgment on the pleadings or for summary judgment." (Docket No. 36.) In their filings, the parties address only the declaratory judgment count regarding the duty to defend. In November of 2015, this Court granted the parties' joint request to file their motions under seal, with redacted copies added to the public docket.

## Standard of Review

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." This Court reviews motions for judgment on the pleadings under a standard that is essentially the same as that for a motion to dismiss under Fed. R. Civ. P. 12(b)(6), except that "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte–Torres v. Univ. of P.R.,* 445 F.3d 50, 54–55 (1st Cir. 2006). Facts contained in the pleadings are viewed in the light most favorable to the nonmovant, and all reasonable inferences are drawn in his or her favor. *Zipperer v. Raytheon Co.*, 493 F.3d 50, 53 (1st Cir. 2007). Judgment on the pleadings is appropriate "only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Id.* (quoting *Aponte–Torres,* 445 F.3d at 54).

When reviewing a motion under Rule 12(c), the court "may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'" *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). When the court is confronted with cross-motions for judgment on the pleadings, the pertinent inquiry is "whether

either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.* (quoting *Barnes v. Fleet Nat'l Bank, N.A.,* 370 F.3d 164, 170 (1st Cir. 2004)).

## **Discussion**

### A. *The Duty to Defend*

In Massachusetts, the law regarding an insurer's duty to defend is well settled. *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 403 (1st Cir. 2009); *HDH Corp. v. Atl. Charter Ins. Co.,* 681 N.E.2d 847, 850 (Mass. 1997). The duty to defend is broader than the duty to indemnify and is based on an assessment of the insurance policy, the facts alleged in the underlying complaint against the insured, and facts known or readily knowable by the insurer. *See BloomSouth Flooring Corp.*, 562 F.3d at 403. "An insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms." *Billings v. Commerce Ins. Co.,* 936 N.E.2d 408, 414 (Mass. 2010). "The duty to defend is determined based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint." *Ferreira v. Chrysler Grp. LLC,* 13 N.E.3d 561, 566 (Mass. 2014) (quoting *Metropolitan Property & Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 667 (Mass. 2011)). "In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Billings,* 936 N.E.2d at 414 (quoting *Sterilite Corp. v. Cont'l Cas. Co.,* 458 N.E.2d 338, 341 (Mass. App. Ct. 1983)). "However, 'when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the complaint.'" *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,* 788

N.E.2d 522, 531 (Mass. 2003) (quoting *Timpson v. Transamerica Ins. Co.*, 669 N.E.2d 1092, 1095 (Mass. App. Ct. 1996)) (quotation marks and citation omitted).

In determining whether the insurer has a duty to defend, the process is not limited to "looking at the legal theory enunciated by the pleader." *Billings*, 936 N.E.2d at 415 (citation omitted).  Rather, the court must consider "what kind of losses may be proved as lying within the range of the allegations of the complaint," and then determine "whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Essex Ins. Co.*, 562 F.3d at 403-04 (quoting *Open Software Found., Inc. v. U.S. Fid. & Guar. Co.,* 307 F.3d 11, 16 (1st Cir. 2002)).  The pertinent inquiry is "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* at 404 (quoting *Hazen Paper Co. v. United States Fid. & Guar. Co.,* 555 N.E.2d 576, 583 (Mass. 1990)).  The insured bears the burden of proving coverage under a CGL policy. *Id.*  If the insured satisfies his burden, then the insurer must prove that an exclusion applies in order to avoid coverage. *Id.*

    B. *Property Damage*

The policies at issue in this case provided coverage for "sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (CGL Policy at 115.)   All America argues that it had no duty to defend IMS because the Ladas complaint did not allege "property damage" within the meaning of the Policies.  The Policies define "property damage" as "Physical injury to tangible property, including all resulting loss of use of that property," or "Loss of use of tangible property that is not physically injured." (CGL Policy at 128.)  All America argues that, as "property damage" is construed in CGL policies under Massachusetts law, it requires physical damage to property other than that of the insured.  Mere repair or replacement of the insured's property does not trigger coverage.

All America's argument is based on the precept that "CGL coverage is primarily directed to liabilities *other* than defects in one's own work." *Am. Home Assur. Co. v. AGM Marine Contractors, Inc.*, 467 F.3d 810, 812 (1st Cir. 2006).  Although this concept is well-established in insurance law, its analytical placement in CGL coverage analyses has not been consistent.  As the First Circuit has noted, "[s]ome courts have held that faulty workmanship by the insured, so far as damage is only to its product, does not constitute an 'occurrence' under CGL policies, . . . and others have held that faulty workmanship does not constitute 'property damage,' . . . [while] other courts have focused solely upon the exclusions of the CGL policy." *Id.* (citations omitted).  Although Massachusetts courts have not developed a consistent mode of analysis in this regard, in several decisions involving damage to the insured's product the courts have declined to address the issue within the realm of defining "property damage" and have instead focused on the relevant exclusions. *See Commerce Ins. Co. v. Betty Caplette Builders, Inc.*, 647 N.E.2d 1211, 1213 (Mass. 1995); *Lusalon, Inc. v. Hartford Acc. & Indem. Co.*, 511 N.E.2d 595, 597 (Mass. 1987); *Pac. Indem. Co. v. Lampro*, 12 N.E.3d 1037, 1043 (Mass. App. Ct. 2014); *see also Oxford Aviation, Inc. v. Glob. Aerospace, Inc.,* 680 F.3d 85, 88-92 (1st Cir. 2012).

Here, the parties' disagreement centers on whether the Ladas complaint alleged damage to property that belonged to someone other than IMS.  I find that the complaint did make these allegations.  According to the complaint, the crux of the problem ▓▓▓▓▓▓ was the faulty ▓▓ epoxy on the power supply case, which caused ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  The Ladas complaint stated that IMS applied the ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

10

███████████ of the power supply assembly. However, the Ladas complaint does not specify the relationship between Central Metal Finishing and IMS, nor does it define precisely which portions of the power supply assembly IMS was tasked with creating. At the duty-to-defend stage, these questions need not be answered. It is sufficient that, pursuant to the Ladas complaint, IMS's allegedly faulty epoxy potentially caused damage to components that were supplied by other entities. Thus, I find that the Ladas Complaint alleged a possibility of covered property damage, and All America's duty to defend will not be denied on this basis.

C. <u>Occurrence</u>

Next, All America argues that even if the Ladas complaint alleged property damage, this damage was not caused by an "occurrence" as that term is defined under the Policies and applicable law. The Policies apply only to property damage that is caused by an "occurrence." (CGL Policy at 115.) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (CGL Policy at 127.) Under Massachusetts law, an "accident" is commonly defined as "an unexpected happening without intention or design." *Lampro*, 12 N.E.3d at 1042 (citing *Liberty Mut. Ins. Co. v. Tabor*, 553 N.E.2d 909, 912 (Mass. 1990)). In the context of insurance coverage, the word has been broadly construed. *Quincy Mut. Fire Ins. Co. v. Abernathy*, 469 N.E.2d 797, 799 (Mass. 1984). "Accident" encompasses injuries that are caused "recklessly." *Id.* And, even "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Id.* "If, however, an insured knows with substantial certainty that harm will follow

from his conduct, like setting a fire, it is not necessary that he gauge the degree of harm with precision." *Smartfoods, Inc. v. Northbrook Prop. & Cas. Co.*, 618 N.E.2d 1365, 1367 (Mass. App. Ct. 1993).

All America argues that IMS's actions of changing the composition and application of the epoxy were intentional acts of misconduct, and thus the resulting damages were not accidental. In response, IMS asserts that its conduct, as pled in the Ladas complaint, falls under the broad construction of accident because there are no allegations that IMS specifically intended the injury that resulted from its changed manufacturing process. Although the Ladas complaint shows that IMS intentionally changed the epoxy process, the facts do not show that IMS knew with substantial certainty that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Given the liberal interpretation of "accident," and the broad construction of the duty to defend, I find that the Ladas complaint does not conclusively establish that the results of changing the epoxy process were not accidental. Therefore, the damages were potentially caused by an "occurrence."

D. *Damages*

All America briefly argues that it did not have a duty to defend IMS because Ladas did not seek damages, as his complaint contained only FCA claims. Under Massachusetts law, "damages" is defined as "the word which expresses in dollars and cents the injury sustained by the plaintiff." *116 Commonwealth Condo. Trust v. Aetna Cas. & Sur. Co.*, 742 N.E.2d 76, 79 (Mass. 2001) (quoting *Turcotte v. DeWitt*, 131 N.E.2d 195, 197 (Mass. 1955)). This includes "injunctive relief that requires the insured to incur costs to remedy covered losses." *Omega Flex, Inc. v. Pac. Employers Ins. Co.*, 937 N.E.2d 52, 57 (Mass. App. Ct. 2010) (citing *Hazen Paper Co.*, 555 N.E.2d at 582-83).

In his prayer for relief, Ladas sought an injunction to stop IMS from continuing to violate the FCA; ███████████████████████████████████████; and monetary damages on behalf of the United States government. In an FCA suit, like the Ladas action, monetary damages would include the costs of reimbursing the government for the amount that the defendants received on account of their fraudulent actions, plus statutory multipliers and civil penalties. These costs could potentially encompass some insurable amounts with regard to IMS, as could the requested injunctive relief. Accordingly, I find that IMS has satisfied its initial burden of showing that the damages claimed in the Ladas action were potentially within the bounds of the Policies' primary coverage.

E. *Business Risk Exclusions*

As mentioned above, Massachusetts courts recognize the overarching rule that "CGL coverage is primarily directed to liabilities *other* than defects in one's own work." *AGM Marine*, 467 F.3d at 812. In this vein, All America argues that several "business risk" exceptions apply to this case. Because "[g]eneral liability coverage is not intended as a guarantee of the insured's work," CGL policies such as the one at hand "contain 'business risk' exclusions." *Lampro*, 12 N.E.3d at 1043 (quoting *Dorchester Mut. Fire Ins. Co. v. First Kostas Corp.,* 731 N.E.2d 569, 572 (Mass. App. Ct. 2000)). These exclusions express the principle that "[t]he risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." *Betty Caplette Builders, Inc.*, 647 N.E.2d at 1213 (citation omitted).

The risks relating to repair or replacement of the insured's faulty work or products are not intended to be insured, because these "are a normal, foreseeable and expected incident of doing

business and should be reflected in the price of the product . . . ." *BloomSouth Flooring Corp.*, 562 F.3d at 407 (quoting *Sterilite Corp.*, 458 N.E.2d at 343 n.13). "Thus, a distinction is drawn between 'faulty workmanship' claims involving only the insured's own work product, for which a defense need not be provided, and claims for damage to the property of a third party, for which a defense is required." *Id.* quoting *Frankel v. J. Watson, Inc.,* 484 N.E.2d 104, 106 (Mass. App. Ct. 1985)). Exclusions are strictly construed under Massachusetts law; All America will be relieved of its duty to defend only if it has shown, based on the allegations in the Ladas complaint, that the exclusions completely precluded coverage. *See Abernathy*, 469 N.E.2d at 799; *Vappi & Co. v. Aetna Cas. & Sur. Co.*, 204 N.E.2d 273, 276 (Mass. 1965).

All America identifies three exclusions at issue in this case: "J(6)," "M," and "N." The J(6) exclusion is a standard faulty-workmanship exclusion, which Massachusetts courts have construed to apply to the costs of repairing damage to other aspects of an overall project, if the costs are directly caused by a subcontractor's faulty work. *See Lusalon,* 511 N.E.2d at 597. This exclusion precludes coverage for property damage to: "That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (CGL Policy at 118.) "Your work" is defined as: "Work or operations performed by you or on your behalf" and "Materials, parts or equipment furnished in connection with such work or operations." (CGL Policy at 129.) However, this exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard.'" (CGL Policy at 118.) The "products-completed operations hazard," in turn, includes "all . . . 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"[4] (CGL Policy at 128.)

---

[4] The "products-completed operations hazard" also contains several exclusions, including "products that are still in your physical possession" and "work that has not yet been completed or

All America argues that the J(6) exclusion applies because IMS's "work" was the improperly plated power supply case, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. All America relies on an instructive decision by the Supreme Judicial Court, *Lusalon, Inc. v. The Hartford Acc. & Indem. Co.,* 511 N.E.2d 595 (Mass. 1987). In *Lusalon,* the plaintiff was a masonry subcontractor that caused damage to the adjacent door and window frames of a building while it was installing concrete masonry block. *Id.* at 596. Specifically, the subcontractor splattered mortar on the door and window frames and, in the course of removing the mortar, applied—and failed to properly remove—a cleaning agent known as muriatic acid. *Id.* The door and window frames were then painted, and the paint peeled as a result of the acid. *Id.* The Supreme Judicial Court rejected the plaintiff's argument that a faulty-workmanship exclusion in the policy[5] was limited to the repair of the plaintiff's precise work product, which was masonry, and did not cover the damage to the door and window frames. *Id.* at 597. Rather, the Court held that the exclusion applied to damage that was directly caused by the insured's faulty work-product. *Id.*; *see Bond Bros. v. Robinson*, 471 N.E.2d 1332, 1333-34 (Mass. 1984) (interpreting identical exclusionary language to deny coverage where a subcontractor's faulty installation of rebar caused the failure of a concrete foundation poured by the general contractor).

Here, like in *Lusalon*, IMS's work—regardless of what portion of the power supply assembly—was itself a component part of a larger product. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

abandoned"; however, these exclusions do not affect the analysis of whether the J(6) exclusion applies to the case at hand.

[5] The wording of the exclusion was nearly identical to the exclusion at issue here, eliminating coverage for property damage to "that particular part of any property . . . the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured." *Lusalon*, 511 N.E.2d at 597.

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

Crucially, however, the complaint did *not* allege that IMS's faulty work caused damage to any third-party property outside of ████████████████. This is distinguishable from a scenario in which the insured's negligent work on a project causes damage to third-party property that is not part of the overall project, in which case the faulty-workmanship exclusion would not apply. *See Fed. Ins. Co. v. Hermitage Ins. Co.*, No. CIV.A.00-12310-DPW, 2002 WL 31194872, at *4 (D. Mass. Sept. 25, 2002) (faulty workmanship exclusion did not apply where negligent demolition on the insured's property caused damage to adjoining building).

Thus, the J(6) exclusion would bar the potential for coverage in this case—but for the fact that All America's *Lusalon* analysis fails to address the entirety of J(6). As noted above, the J(6) exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard,'" which includes "all . . . 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" (CGL Policy at 118, 128.)

The case of *Oxford Aviation, Inc. v. Glob. Aerospace, Inc.,* 680 F.3d 85 (1st Cir. 2012), is instructive here for its analogous facts.[6] In *Oxford Aviation*, Oxford was a company that contracted to repair an aircraft. *Id.* at 86. On the flight back to the owner's location from Oxford's premises in Maine, one of the plane's side windows cracked. *Id.* at 86. The owner later sued Oxford, complaining about the window and a slew of other allegedly substandard work performed on the plane. *Id.* at 86-87. In the ensuing litigation regarding Oxford's insurer's duty to defend, the First Circuit construed an exclusion that was identical to the J(6) exclusion at issue in the case at hand,

---

[6] Although the court in *Oxford* applied Maine law, the analysis with regard to the J(6) exclusion is entirely consistent with Massachusetts law and does not rely on any Maine precedent.

16

including its language regarding the products-completed operations hazard. In rejecting the exclusion's applicability to the broken window, the court explained:

> The . . . exclusion . . . fails to negate the duty to defend. Conceivably, the cracked side window is a "particular part" of property "on" which Oxford performed work. . . . But the your-work exclusion by its terms does not apply to "property damage occurring away from premises you own or rent and arising out of your product or your work," and [the plane's owner] explicitly alleged that the crack occurred in-flight.

*Oxford*, 680 F.3d at 90. Thus, the court held that the exclusion failed to negate the insurer's duty to defend.[7] *Id.*

Here, like in *Oxford*, the Ladas complaint alleged that some damage to ▮▮▮▮▮▮▮▮▮▮ after they left IMS's premises. As alleged, the changed epoxy process caused less-effective adhesion, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. According to the Ladas complaint, the weak adhesion could appear satisfactory at first but then

---

[7] The oddity of this conclusion was not lost on the court:

> This is a curious case. Reading the complaint against the exclusions, one must agree with the district judge that the underlying liability is only to [the plane's owner]; that the alleged property damage to [the plane's owner], if proved as charged, likely traces back to defective work by Oxford; and that such damage to the insured's client resulting from such a cause is what the business-risk exclusions taken together hope to cabin, limit and usually preclude.
>
> But for obvious reasons (*e.g.,* to cover consequential damages claimed by third parties), the CGL policy does not have an exclusion broadly written to exclude *all* claims arising from faulty workmanship. Rather, [the insurer] has crafted complex exclusions occupying several pages of text; and they have created an opportunity in some cases for a complaint to circumvent all of them. Here, at least one scenario relating to the cracked window, occurring in flight and away from Oxford's facilities, does fall within coverage and could plausibly avoid all cited exclusions.

*Oxford*, 680 F.3d at 91-92.

would develop damage as the product was exposed to various temperatures, moisture, and electrical power. Thus, the latent nature of the alleged damage suggests that much of it did not occur until the products had left IMS's facilities. The complaint alleged that there were product failures at IMS, but also at Central Metal Finishing, at ITT Power Solutions, and at ITT Night Vision. And, many of the ███████████████████ were nevertheless likely to fail later on: "the testing [at ITT] was only designed to identify power supply cases with current peeling issues; it did not screen out power supply cases with surfaces that would deteriorate over time and when subjected to the rigors of use." (Ladas compl. at ¶ 93.) Thus, I find that the Ladas complaint alleged that property damage may have occurred away from IMS's premises, arising out of IMS's product or work. This damage would be covered by the products-completed operations hazard, which means that it would not be subject to the J(6) exclusion. Accordingly, All America will not be released from its duty to defend on this basis.

All America also argues that the Policies' "M"[8] and "N"[9] exclusions apply, but concedes that these exclusions would not apply if there was damage to property owned by someone other

---

[8] This exclusion precludes coverage for
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> 1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> 2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(CGL Policy at 118.)

[9] This exclusion precludes coverage for:
> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
> 1) "Your product";
> 2) "Your work"; or
> 3) "Impaired property";
> If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a

than IMS.  As explained *supra*, I find that the Ladas complaint alleged the possibility of third-party property damage, ███████████████████████████████, were not added to the product by IMS.

Because IMS has met its burden of showing that the Ladas complaint alleged potentially covered property damage, and because All America has not met its countervailing burden of showing that one of the Policies' exclusions bars coverage, I find that All America had a duty to defend IMS in the Ladas action.  Accordingly, IMS is entitled to judgment on Count I of the complaint.

## Conclusion

For the reasons set forth above, Defendant's motion for judgment on the pleadings (Docket No. 32) is ***denied***, and Plaintiff's cross-motion for judgment on the pleadings (Docket No. 36) is ***granted***.  Judgment shall be entered in favor of Plaintiff on Count I.  Pursuant to the Policies, All America had a duty to defend IMS in the underlying Ladas action.

**SO ORDERED.**

                                                     */s/ Timothy S. Hillman*
                                                     **TIMOTHY S. HILLMAN**
                                                     **DISTRICT JUDGE**

---

      known or suspected defect, deficiency, inadequacy or dangerous condition in it.
(CGL Policy at 119.)